Let's call the next case, which is 21-1049, Estate of Susanne Burgaz v. Jefferson County Board of Commissioners. And for the appellant is Mr. Warren. You may proceed. Good morning, Your Honor, and may it please the Court. My name is Zach Warren, and I represent the plaintiff appellants in this matter, including the estate of Susanne Burgaz and her three children, each in their individual capacity. I'd like to, with the Court's permission, reserve three minutes for rebuttal at this time. Thank you, Your Honor. I want to sort of focus my comments this morning on the constitutional claims against the individual defendants. And we want to start by really acknowledging the fact that jail officials cannot absolutely guarantee the safety of incarcerated persons. And as this Court is very well aware, sadly, there are many, many instances where incarcerated individuals may engage in self-harm or even suicidal behaviors where there's really not much of an objective indication that they intend to do so, that they sort of surprise jail officials in harming themselves or even completing suicide. There are also many, many instances where there may be very clear indicators, very clear indicators of a particularized risk with respect to an incarcerated person that they will self-harm or engage in suicidal behavior, but for whatever reason, the jail officials fail to connect the dots. They just don't make the connection between the objective risk and their own subjective awareness. What's important to know about this case is that it's very different. Ms. Burgess, as we pled in the amended complaint, at the time she harmed herself in this case, was red-flagged as a suicide risk specifically, not just as someone with a generalized mental health condition, not someone who had engaged in lower-level self-harm, not just somebody who had some sort of unusual behaviors that could reasonably be attributed to things aside from suicidality. This is someone who was red-flagged as a suicide risk based on previous behavior within the very same facility. To their credit, the jail officials here recognized that real and present risk. Let me ask a little bit about the red flag. This was on the Tiburon system? It was indicated in the Tiburon system, yes, sir. There's no other source you're relying on to support the allegation that there was subjective knowledge of her risk, is that right? No, Your Honor. Oh, I'm sorry, I had a delay. I didn't mean to cut you off, Your Honor. Was there any other way that the defendants knew that she had been flagged as a suicide risk except through the Tiburon system? Your Honor, there were a number of ways that the individual defendants were subjectively aware about the accuse. That wasn't my question. I know you say some of her behavior should have tipped them off, but the fact that she was red flagged was available to the defendants only through the Tiburon system. Is that correct? That's the only way you would allege that they knew of the red flag? They knew of the red flag, Your Honor, because there is a practice and a policy in place both at the Jefferson County Detention Facility and other jails, as the court is aware. It's a process called hand down, and so hand down is where there is an exchange of information between and among- I see you shaking your head, Your Honor. I don't think you're answering my question. What was handed down, though, was what was on the Tiburon system. Is there any other ultimate source other than the Tiburon system? There was some posted list of suicide risk or something like that. The only source of this prior determination that she was a suicide risk was the Tiburon system. Is that correct? Yes, Your Honor. That's correct. I'm sorry. I didn't fully understand. That's available on- how would they- are you alleging that they're supposed to check this website or whatever it is whenever someone is admitted to the jail, incarcerated, to see what Tiburon says about the suspect? Is that right? No, we're not alleging that they have an affirmative duty to go into the Tiburon system and to check for every single detainee that's within their custody and care. No, Your Honor. What we're saying in this case is that, to their credit, upon intake, Jefferson County jail officials identified the acute particularized suicide risk for Ms. Burgess, and they noted that in the Tiburon system. So if you pull up Ms. Burgess's file within the Tiburon system, you will see an active red flag for her particular suicide risk at that time. Because she was assigned to the SHU, the Special Housing Unit, which is designed- Wait, wait, wait, wait. This is something I didn't perceive before. So the Tiburon system red flags her as a suicide risk. And you're saying if you access that system, you will see that when the decedent was incarcerated, the jailers, somebody at the jail, downloaded that information or received that information and that's been checked off in some way. So it's clear that the jail had checked the Tiburon system and knew that she was red flagged as a suicide risk. Is that what you're alleging in the complaint? That's exactly correct, Your Honor. So what we've done is we have plausibly alleged that both of the individual defendants, at the time she harmed herself, were aware of the red flag. Okay. But we don't know if they're the ones, that any of the named defendants were the ones that obtained this information off Tiburon. That's another step in your chain of reasoning. Is that right? So you know somebody at the jail did access that when the decedent was admitted. And then there's an inference that you're alleging that the defendants received that information and you're saying that's because of the hand down process. Am I understanding you correctly? That's exactly right, Your Honor. And the only thing I would- You're not saying any of the defendants were the ones that actually read that information on the system. Is that right? No, Your Honor. That's it. That's correct. And because, to put this into context, we're here on a Rule 12 motion for someone who was incarcerated at the time and is now deceased. So without discovery, we cannot, in good faith, plausibly allege that these particular individual defendants accessed the system and directly viewed it. But what we do know, what we do know is that based on the training and policies in place at the jail at the time, and specifically in the special housing unit, it was incumbent on them to identify and to exchange information explicitly for the purpose of protecting individuals at risk of suicide from harming themselves. So because they're working in the SHU, because the SHU is designed to accommodate detainees who are in active suicide risk, there are all sorts of suicide mitigation changes to the cells, there are different policies in place, there are different monitoring and observational requirements of the officers in the SHU. So they know, they know that their job is to identify and monitor individuals who are at a known risk of suicide. And because of these hand-down policies, because of their training, because of the very fact that they're in the SHU, and this is part of their explicit responsibilities under the post order, for instance, that we referenced in the amended complaint, we plausibly allege that they were aware at the time that she harmed herself of the red flag. But we cannot- How long after she was admitted, how long after she was admitted did she commit suicide? Oh, about one day, your honor. Very, relatively quickly. Okay, but you're not saying that the defendant officers were on duty at the time that the information was downloaded from Tiburon? So he passed on through a couple shifts, is that right? This information, suicide risk, was known to somebody at the jail, because of the computer screen, but then would have to have been handed down through a couple shifts before it gets to the defendants who were on duty at the time she committed suicide, is that correct? I think that's correct in the sense that that's one way they could come about that information. But what we've alleged, and what I'm trying to articulate now is that because of the very specific circumstances within the SHU, it is incumbent on the officers, and particularly the officers who are effectuating that post order, who are making observations, to identify folks who are at increased risk, like Ms. Burgess. So to be frank with you, your honor, it is possible, once we get into discovery, it is possible that, for instance, one of the individual defendants could say, yes, we are trained to gather and develop information about acute suicide risks. It was indicated in the Tiburon system that there was a red flag, but we just sort of ignore that. I never saw it. I wasn't actually aware. And we just ignore those suicide red flags. Your theory is if they didn't know, it was because they violated their duties. Absolutely, your honor. And beyond that, I would say I would acknowledge that on summary judgment or a trial, it would make our case more difficult with the claim against that individual defendant. It would also be a windfall for our Monell claim, right? If, in fact, they have a system for identifying individuals, incarcerated individuals that are at an acute and particularized risk of engaging in suicide, it's documented, it's identified. There's a process by which they should exchange that information and they fail to do so habitually, then obviously that strengthens the Monell claim as well. And we would concede that it would make the claim against that particular individual defendant more difficult because they may not have the requisite subjective awareness is just focusing on deputies police. Did your allegations establish that he knew the decedent was in the control room? Yes, your honor. And I know I know you alleged he didn't look in there, but did he know that somebody was in there? Yes, your honor. I would say two things about that just very briefly, because I see that I'm short on time. One is we established that defendant Scalise was aware that she was an acute particularized suicide risk and that she was in the day room, which is objectively known to be the most dangerous area of the shoe. All of the cells in the shoe, because of this very specific subset of detainees that are admirable, commendable suicide mitigation measures, the day room does not the day room does not. So we have alleged that defendant Scalise knew that she was in there, that he failed to observe her directly in violation of the post order. And I would just say very briefly on that point, we readily acknowledge that the mere violation of an internal policy does not necessarily constitute a constitutional violation. So if this were in general population, for instance, and there was a detainee who had absolutely no indication that they would engage in any sort of suicidal behavior in the jail, deputies fail to observe them at regular intervals. Intervals that doesn't necessarily constitute a constitutional violation in this particular case, when you're in the shoe with a known acute risk and then you fail to observe the dangerous area of the shoe, you have made the connection that there is an imminent risk of serious bodily injury or harm and fail to take reasonable measures to abate that risk. So unless there's anything further out, Mr. Warren, I have a question about deputy. Is it Pesopane? Is that how you pronounce the name? Your Honor, I'm not entirely sure we haven't had the opportunity to do that. That's fine. So the complaint indicates that he told Ms. Burgess that she was not going to be released and and that she was upset about that, despondent about that. My question is, how was the deputy trained to recognize whether Ms. Burgess was suicidal based on the fact that she was upset about this information? I mean, he's not he's not a medical professional. So how why should why should he be attributed with the ability to recognize whether someone is more or less suicidal? Yes, Your Honor, and we're very aware of the cases where somebody who has engaged in relatively innocuous behaviors. And I see that I'm out of time and I have permission to go ahead and answer his question. So we're acutely aware of the cases out there where a detainee is engaged in relatively innocuous behavior. There's no particular reason for folks to suspect that they might be engaged in suicidal behaviors. And then they do something that just sort of fails to trigger a subjective awareness on the part of the jail that this is different. So for Deputy Pezapan, the work was already done. So you come in with a full subjective awareness that this person is an acute suicide risk to begin with. And I would just add to that, Your Honor, that it's not just Suzanne's reaction when she learns the news. What we've alleged in the amended complaint is a series of interactions where Suzanne pled her case on video with Defendant Pezapan, where Defendant Pezapan engaged her at the window. They had this conversation. She escorted Suzanne. They were interacting all the while. And then based on the video evidence, it's not just a bare allegation about what a reasonable juror could see. That Suzanne was obviously despondent in that moment in closing a slider door and locking Suzanne in the most dangerous area and failing to observe her in that area was a failure to abate a known risk. All right, counsel, appreciate that. Let's hear from Jefferson County. Ms. Kumkowski, you may proceed. Thank you very much, Your Honor. Good morning and may it please the court. My name is Rebecca Kumkowski. I'm arguing on behalf of Jefferson County Sheriff Jeff Schrader and Deputies Pezapan and Scalise. Thank you for having me. Now, as Mr. Warren notes and as the state noted in its reply brief, the key issue on appeal in this case is whether it has sufficiently pled the subjective component of its deliberate indifference claim against the deputies who've asserted qualified immunity as it relates to Ms. Burgas's death by suicide in the Jefferson County jail. And I'll just say this is not a plausibly pled claim. It's based upon inference, upon inference, upon inference. That's the way that this claim builds. Now, I really want to address the discovery issue before that came up and before it gets away from me. There is no doubt that qualified immunity applies at the motion to dismiss stage. I don't believe that Mr. Warren would contest that. And I want to be very clear with this court. Plaintiffs waived their right to discovery in this case. Had they made the argument that they needed discovery to develop their claims, limited discovery? There are cases that allow that. But here's what happened in this case. In this case, the parties agreed to a joint motion to stay discovery pending the motion to dismiss ruling. And so that's what happened. And that's appropriate. So it's not fair to suggest that if only they were given more discovery or had been able to conduct discovery, they could have made a colorable claim. That's not the way that qualified immunity works. So I just. Well, counsel, but the way rule 12B6 works, you do agree that reasonable inferences are permitted to the plaintiff at the 12B6 stage, wouldn't you? Isn't that pretty well established procedural law? Certainly, your honor. And I'll just emphasize reasonable inferences. So let's talk about that. As this court is well aware, the Supreme Court jurisprudence on deliberate indifference is actual knowledge. And in Farmer versus Brennan in 1994, the Supreme Court said the official must both be aware of the facts from which the inference could be drawn that a substantial risk, substantial risk of serious harm exists and must also draw the inference. So once, as this court noted in Cox versus Glenn, the deputies asserted that qualified immunity defense, the burden shifts to the estate. And not only does the estate have to show a constitutional violation, the trial court said no constitutional violation here. And I'll talk about that, but also that the right that they violated was clearly established. And as in Cox here, and this is a panel of this court's language, the estate made no more than an anemic attempt to carry this burden as to the clearly established law, merely asserting in bare bones fashion that the constitutional right to be free from deliberate indifference had been clearly established for decades. So put another way, again, this court's words, not mine. The estate, like Ms. Cox, did virtually nothing to define the contours of the clearly established law question, and that was its burden to carry. So let's talk about the allegations as they relate to these particular deputies, not individuals in the jail in general, because this court has rejected that way of proving deliberate indifference. And in Heidel versus Mazzola, which is a motion for summary judgment case, as Mr. Warren pointed out in his briefing, this court said deliberate indifference cannot be predicated on a risk of harm to the inmate population as a whole. And that would include a heightened risk of harm in the shoe. Let's get to the chase. Happy to hear you have here. You have a red flag on the system that was read by somebody at the jail after the plaintiff was admitted. And if and if the required procedures were followed, the officers would have been alerted to this. I disagree. Why is that not a possible? OK, then explain why. Your Honor, let's talk about that. So Ms. Burgas comes into the jail. She's screened by jail staff and her prior incarceration history is reviewed not by these deputies, but is reviewed and taken screening process. That review does show that she was previously red flagged. But let's talk about what that means. The red flag. And this is in 40 paragraphs, 41 and 42 of the complaint. And so just I'm sorry, but can I just make sure I'm clear on one thing? Yes. I thought that the Tiburon system showed that she was previously under suicide watch and that she was red flagged on intake for this particular detention. And Mike, is that not right? So let me let me explain what the red flagging is, because I do think there's some confusion on that. So because she had previously been placed on a suicide watch, that is analogous to the red flag in the system. That is just an indicator that she'd previously been on a suicide watch in the facility. Now, notably, so that follows her through any future incarceration. Notably, the allegations do not do not. Well, the complaint is silent on the fact of how long ago this was. That is, how long ago was she incarcerated? How long ago was the red flag put into place? And very notably, she is screened again and she is not put on a suicide watch, which is what she was put on a suicide watch at a prior incarceration. And the complaint says, look, suicide is dynamic. This is paragraph forty nine of the amended complaint. She was screened. What do you mean by she was screened and not put on suicide watch this time? So screened or what's the system? And is this in the complaint? Is this in the complaint? Yes. So she was screened. The complaint says she was screened and not put on suicide watch. It says that she was screened and in paragraph forty one and that she had been red flagged because of a prior suicide watch. Nowhere in the complaint does it say that she was on an active suicide watch following that screening. So when an individual comes into the jail. Well, counsel, in your brief and I'm quoting, you say that she was previously screened and found not to be appropriate for a suicide prevention protocol. At this incarceration, your honor. Where do we see that in the complaint? The complaint does not allege she's on a suicide watch. No, I understand. But but you're you're you're arguing facts that aren't in the complaint. Your honor, I'm arguing that plaintiff is relying on the red flag, which is tied to a prior suicide watch at a remote in time prior incarceration. Don't even know when that incarceration was and that if you if you look at the complaint, there's nowhere that says that she is placed on a suicide watch at this incarceration. And in fact, she was not placed on a suicide watch at this incarceration or they could have alleged that. And they did not. And that's the difference between the red flag and the suicide watch. Well, what what what what shows maybe she wasn't put on it, but maybe maybe that was a then what sort of what sort of is there anything in the complaint? That indicates how she was reviewed upon admission this time, but she's incarcerated this time. What anything about what steps were taken to determine whether she was suicidal or should be under suicide watch? Just just that she was screened by jail staff in the same, I would say, in the same manner that they screen every other inmate. So to be said, is that alleged in the complaint? I believe so, your honor. Again, I would point to what and what does that what does that screening entail? Is there a psychiatrist or someone who your honor, there is this is not in the record. The complaint is silent as to that piece. I'm happy to speak to it. But it is not in the record. It's a dual screening by counseling staff at the jail. And then there's also a medical screen by medical staff. And these questions are asked. And so sufficient to say there is a group of individuals who are not named in this lawsuit who screen for guys and make a determination that she is not appropriate for a suicide watch at this incarceration. But what other reasons are admit detainees placed in the shoe besides suicidal history? Thank you, your honor. That's a wonderful question. So in paragraphs 247 and 84 of the amended complaint, the allegations are she's using a walker so she has mobility issues. That would be one reason to be placed in the special housing unit, the shoe. So paragraph two states it's an area of the jail specifically designed both for suicidal inmates, but also others with most the most intensive needs in the jail. So mobility qualifies serious medical issues that are not mental health related qualifies. And so it would be I think it's an inappropriate inference to draw that everyone in the shoe is a heightened suicide risk. But why? Why would it be an inappropriate inference to conclude that she was put in the special housing unit because she's a suicide risk? For two reasons, your honor. Again, I go back to that the point that she was not placed on a suicide watch. The complaint does not allege that anywhere. And that would that may be, but she had been on a suicide watch and she was put in the SHU because of her use of a walker, which she couldn't. How do we know that? I mean, it's a let me know that it was because of her walker. And how would we know that from the complaint? Thank you, your honor. It's alleged in the complaint that she was using a walker and so she wouldn't have been able to be in the general population. The other point I'll make is just that I'm still, you know, now you're asking us to draw inferences in favor of the defendants. I don't believe I am, your honor. I'll say that when you look at the way that the complaint, the amended complaint describes the SHU, as I said, it does describe it as an area for essentially inmates with higher needs. That includes suicidal inmates. That's paragraph two, but it also includes, and these are the words from the complaint, others with the most intensive needs. Paragraph 47 says it's a secure housing unit for inmates with higher needs than the general population. Again, she's limited mobility. She's there because of her walker. And I do think it's notable that she goes through this screening process, not undertaken by the deputies who are named here. Counsel, I'm reading paragraph 47. Due to a variety of factors, including the fact that she was red flagged for suicide, suicidality, Susan Burgess was immediately assigned to the special housing unit. So don't we have to accept that as, as, as true on a rule 12 B motion? Your honor, because of the way that the complaint talks about the red flag, I don't think it's appropriate to draw the inference because again, you have the, the trigger of the red flag was the prior suicide watch. And then you have an absence of allegations that she's placed on a suicide watch, which had that fact existed, they could have alleged it and they did not. And so I don't think it's an appropriate. Well, they, they did allege it. They allege she was assigned to the unit because she. Because of a variety of factors. No, no. One of them was that she, she was suicidal. I don't, I'll just say that's not what the red flag means, your honor. And I think, and I think, well, it has to, it's related to the fact that she was on suicide watch. So what else does it mean? I think that your honor, what I would say is I think that it is an indicator of a prior suicide watch in the facility at a remote in time incarceration. And it was a reason. And it was a reason that she was assigned to the unit. And there are no allegations that these deputies would have reviewed, or as Mr. Warren noted, had any affirmative duty to review her Tiburon entries to know that. So this is the other. Well, that's a separate question, but, but, but, but that's what, that's what paragraph 47, which you've cited to assess. Yes, your honor. If we ask you about the, I'm sorry, go ahead. If we construe the complaint to plausibly alleged that they did have a subjective awareness of a prior suicide watch, does it, does it follow them that, that the plaintiff satisfied pleading burden or deliberate indifference? I don't believe so, your honor. So there are other allegations that plaintiffs are relying on here that are conclusory, right? The idea that the day room in the shoe is particularly dangerous. There are no allegations that there had been previous suicide there. There are no allegations that there had been suicides in the facility that used a television cord, which is the way that Ms. Burgas engaged in her self-harm. And there are no allegations that these that these deputies would have known that. And that's very similar again to the Heidel case that this court decided earlier in this year. And as I know, Judge Timkovich, you were on that panel. The other thing I'll just notice, let's look at the actual alleged interactions that these deputies have. And I see I'm very short on time. So very quickly, six minute conversation between Deputy Pesopane and Ms. Burgas about the fact that she won't be immediately released. No allegations that Pesopane knew that Burgas well enough to notice a mood shift, that she was trained as a lay person to notice a mood shift. And that someone who had been screened just the day before by other staff who Deputy Pesopane could reasonably rely upon, that she would become actively suicidal. And similarly, Deputy Scalise does a walkthrough and there's no indication that he knows that that the shoe is a particularly dangerous place, that what Burgas is doing, although the complaint alleges that it would have been obvious and atypical and alarming, was so atypical. She's up by the television, potentially changing the channel. I see that I'm out of time. And so I think if the court will give me just a few more. Go ahead and finish your thought. So all to say, this is a tragic case, but not every tragedy is actionable. And here the estate simply fails to allege that these individuals, we're not talking about the jail staff as a whole. The court has rejected that type of foundation for deliberate indifference claims that these deputies would have known enough facts to draw an inference that this individual is about to become acutely suicidal after being screened and not being deemed to be suicidal. Or that her demeanor or anything else would have put her, would have put either deputy on notice that she's about to become acutely suicidal. And moreover, plaintiff hasn't met their burden to show that this would have been clearly established. Is this a failure to observe? Is it a failure to identify suicidality? Both of those have been rejected by this court in Heidel and then in Taylor v. Barks. Well, expand on that. I mean, failure to observe someone's, if they subjectively know this person is a suicide risk and don't frequently observe that person, that's not clearly established as being. Your Honor, I would say that if they subject, if they subjectively know, but again, then I think you have to talk about scope. There are no, okay. Yeah, there was one thing. Yes. Wait, wait, wait, wait, but the, but the, you're, you're merging the, the constitutional violation and the clearly established. If there was a constitutional violation here, because we determined that the complaint adequately alleges, I should have asked permission from the chief to pursue this. Matt, may I for a moment? Yeah, I apologize. Um, if, if we determined that the complaint adequately alleges that the officers knew that she was a suicide risk and failed to frequently observe her. Establishing deliberate indifference and therefore constitutional violation. What's that clearly established about that? Your Honor, I would say that you would have to establish the failure to frequently observe by each deputy. And so if you're, um, so, so what we know from the amended complaint is that, um, so even assuming both deputies knew deputy pest pain gets done speaking with. Ms. Burgos at nine or nine, and that's established in the complaint. And then, um, less than the 30 minutes later that would have been required, um, even assuming that this is a suicide unit, which the shoe is not, um, deputy Scalise does a walkthrough and what he would have known in addition to the fact that again, assuming he understands and is subjectively aware that she is a suicide risk is that she's also just spoken with another deputy and been checked on. Um, so even that, I, I don't know that you can say that his, um, allegedly insufficient walkthrough gets you to a clearly established, right. And I do think that's what the Supreme court precedents for the last, um, certainly the last strong run of opinions has said is this has to be very, uh, discreetly defined. Thank you. You're all right. Again, I see I'm well out of time and appreciate the court's indulgence. You're here to answer our questions. Any, anything else, uh, in the panel? Great. Well, thank, thank you very much. I appreciate the arguments from each of you. Um, and you are now excused and we'll submit the case.